**OLD RELIABLE FIRE INSURANCE COMPANY, Plaintiff,**

v.

**CASTLE REINSURANCE COMPANY, LIMITED, Defendant and Third-Party Plaintiff,**

v.

**J. H. MINET & CO., LTD., Third-Party Defendant.**

No. 78–1273C(C).

United States District Court, E. D. Missouri, E. D.

Jan. 14, 1981.

Daniel R. Solin, New York City, Richard Brownlee, III, Jefferson City, Mo., for defendant and third-party plaintiff.

R. J. Robertson, St. Louis, Mo., for third-party defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### Findings of Fact

MEREDITH, District Judge.

1. Plaintiff Old Reliable Fire Insurance Company ("Old Reliable") is a Missouri corporation with its principal place of business in Webster Groves, Missouri. Old Reliable is engaged in the business of underwriting insurance in Missouri and elsewhere.

2. Defendant and third-party plaintiff Castle Reinsurance Company ("Castle") is a Gibralter corporation with its principal place of business in Gibralter. Castle is engaged in the business of reinsuring risks underwritten by insurance companies.

3. Third-party defendant J.H. Minet & Co., Ltd. ("Minet") is an English corporation with its principal place of business in London, England. Minet is engaged in the business of acting as a broker or "intermediary" in the negotiation of reinsurance agreements between insurance companies and reinsurers.

4. Former third-party defendant Adrian N. Baker Reinsurance, Inc. ("Baker Reinsurance") is a Missouri corporation with its principal place of business in St. Louis County, Missouri. Baker Reinsurance is engaged in the business of acting as a broker or "intermediary" in the negotiation of reinsurance agreements between insurance companies and reinsurers.

5. Former third-party defendant Adrian N. Baker ("Baker") is a citizen and resident of the State of Missouri. Baker is the principal officer of Baker Reinsurance.

6. In September, 1975, Old Reliable contacted Baker Reinsurance in an attempt to place with reinsurers a treaty of reinsurance on certain of the insurance underwritten by Old Reliable.

Frank N. Gundlach, P. Terence Crebs, St. Louis, Mo., for plaintiff.

7. Old Reliable supplied Baker Reinsurance with data concerning the business to be reinsured. Baker Reinsurance then contacted Minet by letter dated September 10, 1975 requesting Minet's assistance in placing the reinsurance sought by Old Reliable.

8. Along with the letter of September 10, 1975, Baker Reinsurance sent information to Minet outlining the proposed treaty. Included in this information was the following language:

"The subject business is approximately 65% property and 35% casualty, since the auto physical damage premium should be included in the property total. Of the total automobile premium of $13,300,000, $4,600,000 is physical damage which increases the property premium to $18,400,-000 and reduces the liability premium $8,700,000.

In addition to an aggressive program to obtain rate increases, the Company has tightened underwriting procedures. Particular emphasis has been placed upon obtaining insurance to value through extensive use of inspection reports and automatic increases in apprai.ed value at renewal. These measures are expected to significantly improve underwriting results in the property lines."

9. Utilizing the information provided by Baker Reinsurance, Minet discussed the proposed quota share reinsurance with various underwriters at Lloyds of London who declined to participate.

10. Utilizing the information provided by Baker Reinsurance, Minet discussed the proposed quota share reinsurance with various underwriters of companies outside of Lloyd's operating in the London market.

11. For its discussions on the proposed quota share reinsurance with Lloyd's and other underwriters in London, Minet prepared a placing "slip" outlining the salient terms of the proposed reinsurance.

12. For its discussions with overseas reinsurance companies, Minet prepared a Telex outlining the salient terms of the proposed reinsurance.

13. In the fall of 1975, Dan Fetroll, an underwriter of Minet, met in London, England with Derrick Searle, an underwriter for Indemnity Guaranty Assurance Ltd. ("IGA"), a subsidiary of Castle, in an attempt to place part of the treaty. Mr. Searle did not accept any portion of the treaty on behalf of IGA, but discussed it with Joseph Kaplin, Managing Director of Castle, who had space in the same office as IGA.

14. Several days later, Mr. Kaplin agreed to a 10% line or share of the proposed quota share treaty ("Treaty") on behalf of Castle.

15. At the time Mr. Kaplin was considering taking the line in the Treaty on behalf of Castle, he had available to him the entire Minet broking file including the broking slip prepared by Minet, the Telex prepared by Minet, and a photocopy of Best's Insurance Reports. All of these were made available to Mr. Kaplin by Minet.

16. On November 14, 1975, Castle wrote Minet and confirmed its acceptance of a 10% share in the quota share Treaty.

17. In May, 1976, Minet sent Castle a copy of Quota Share Treaty No. 15250 which David Thirkill, the chief underwriter for Castle, signed on July 5, 1976 on behalf of Castle accepting a 10% line. By its terms, the Treaty was in effect from July 1, 1975 through December 31, 1976. The same Treaty was executed by Old Reliable on May 5, 1976.

18. By early 1977, it became apparent that the claims against the portfolio reinsured under the Treaty would exceed the income thereunder. When the Treaty turned to a loss position, Castle agreed to put up a letter of security for the amount owed to Old Reliable.

19. Castle failed to put up such letter of credit. Subsequently, Castle communicated to Old Reliable its intention to avoid its obligation under the Treaty because of Old Reliable's alleged material misrepresentations and failure to disclose information.

20. On November 22, 1978, Old Reliable brought this action for breach of contract against Castle.

21. Castle filed an answer denying the material allegations of the complaint, alleged three counterclaims against Old Reliable and asserted a third-party complaint which set forth two claims against Minet.

22. Old Reliable denied the material allegations of the counterclaims, and Minet denied the material allegations of the third-party complaint.

23. For its cause of action, Old Reliable alleges that Castle breached its obligations under the quota share Treaty.

24. For its cause of action against Old Reliable, Castle alleges that it was induced to enter into the Treaty based upon false and fraudulent misrepresentations and omissions. It further alleges that these misrepresentations and omissions increased the risk of loss to Castle and that Old Reliable breached certain affirmative duties owed to Castle by virtue of the Treaty.

25. For its cause of action against Minet, Castle alleges that Minet misrepresented the proposed quota share Treaty, or was negligent in failing to know that their representations were false.

26. In the insurance industry, and in the London market in particular, automobile physical damage risk is properly described as "property business."

27. The portfolio to be reinsured by the Treaty was in fact "approximately 65% property and 35% casualty."

28. Included and listed as a part of Old Reliable's portfolio in the Telex relied on by Mr. Kaplin is the heading "Automobile."

29. By custom and practice in the reinsurance industry, and in the London market in particular, the usual and customary practice of underwriters is to ask questions and seek additional information from brokers when they have questions concerning potential business.

30. Mr. Kaplin was an experienced, knowledgeable reinsurance underwriter. He made his decision to accept the 10% line in the Treaty on behalf of Castle fully aware of the problems with automobile insurance and the fact that this treaty contained automobile insurance. Kaplir was content to accept the profits on this treaty but he declined to pay when the reinsurance treaty turned to losses.

## Conclusions of Law

1. This Court has jurisdiction by virtue of 28 U.S.C. § 1332 because there is diversity of citizenship and the amount in controversy excluding interest and costs exceeds $10,000.

2. The Court has personal jurisdiction over Minet by virtue of its contacts with the State of Missouri. *International Shoe Co. v. State of Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945).

3. The Court has personal jurisdiction over Castle pursuant to Article XVIII of the Treaty.

4. The acts and representations of Old Reliable with respect to the placing of the Treaty with Castle were in conformity with the usual and customary practices within the industry and did not amount to fraudulent or negligent misrepresentations or omissions.

5. The acts and representations of Minet with respect to the placing of the Treaty with Castle were in conformity with the usual and customary practices within the industry and did not amount to fraudulent or negligent misrepresentations or omissions.

6. The expressed policy goals of Old Reliable to 1) tighten its underwriting procedures, 2) require policy holders to insure to value, and 3) force policy holders to increase the value of their policies by 30% on renewal did not amount to contractual promises to Castle as part of the quota share Treaty.

7. The actions of Mr. Kaplin in accepting the 10% line in the Treaty on behalf of Castle without substantial inquiry past the Telex were not in accordance with the usual and customary practices within the industry.

8. The parties have stipulated to the premiums and loss payments generated during the Treaty period. Plaintiff's evidence established the other adjustments pursuant to the terms of the Treaty.

9. The Court finds that Castle has breached its contract to pay the sums called for in the agreement and that the damages due plaintiff are $541,322.00 plus interest at the rate of 9% per annum from the date of judgment. *See* R.S.Mo. § 408.040 (1979).

10. The Court further finds that Castle has failed to sustain its burden of proof on its affirmative defenses, its counterclaims and third-party complaint.