## OLD RELIABLE FIRE INSURANCE CO., Appellee,

v.

## CASTLE REINSURANCE CO., LTD., Appellant,

v.

## J. H. MINET & CO., LTD., Appellee.

### No. 81–1165.

United States Court of Appeals, Eighth Circuit.

Submitted Sept. 17, 1981.

Decided Dec. 4, 1981.

---

Thompson & Mitchell, St. Louis, Mo., for appellant Castle Reinsurance Co., Ltd.; Daniel R. Solin, Solin & Breindel, P.C., New York City, of counsel.

Frank N. Gundlach (argued), Thomas B. Weaver, Armstrong, Teasdale, Kramer & Vaughan, St. Louis, Mo., for appellee Old Reliable Fire Insurance Co.

P. Terence Crebs, Stephen H. Rovak, St. Louis, Mo., for appellee J. H. Minet & Co., Ltd.

Before STEPHENSON and McMILLI-AN, Circuit Judges, and HANSON,* Senior District Judge.

STEPHENSON, Circuit Judge.

■ Defendant Castle Reinsurance Co., Ltd. (Castle) appeals the judgment of the district court[1] awarding plaintiff Old Reliable Fire Insurance Co. (Old Reliable) $541,322 in its diversity, breach of contract case. The court also denied Castle relief on its third-party complaint against J. H. Minet & Co., Ltd. (Minet). Appellant Castle contends that many of the fact findings concerning Castle's acceptance of a line in Old Reliable's reinsurance treaty are clearly erroneous. Castle also attacks several conclusions of law by arguing that the industry customs and the contractual promises made by Old Reliable support a denial of relief.[2] We affirm the district court.

## I. BACKGROUND

Old Reliable, a Missouri corporation with its principal place of business in Webster Groves, Missouri, is an underwriter of property-casualty insurance. In mid-1975, Old Reliable became interested in using a quota share treaty to reinsure a portion of the insurance risks that it had underwritten. The company wanted to retain forty percent and cede sixty percent to reinsurers. Old Reliable contacted Adrian N. Baker Reinsurance, Inc. (Baker Reinsurance) for assistance in placing a quota share treaty. Old Reliable supplied Baker Reinsurance with the underwriting information, documents and exhibits necessary for treaty placement. Old Reliable also informed Baker that it was taking steps to improve underwriting through its objectives of tightening underwriting procedures, using inspection reports to insure to value and having automatic increases in appraised value at renewal.

On September 10, 1975, Baker Reinsurance sent a letter to Minet, a London, England corporation, requesting it to act as a broker for placing the Old Reliable reinsurance treaty in the overseas market. Along with the letter, Baker Reinsurance sent information describing the proposed treaty and copies of relevant sections of Best's Annual Reports. Best's is a private company that does financial ratings on every property and casualty insurance company in the United States.

Minet took an active role in placing the treaty. First, Minet attempted to place the treaty in the Lloyd's market but was unsuccessful. Minet then attempted to place and did, in fact, place portions of the treaty in the London market and with overseas reinsurers.[3]

One of the overseas reinsurers that accepted a line on the treaty was Castle. In the fall of 1975, a Minet broker, Mr. Fettroll, met with Mr. Searle, an underwriter for Indemnity Guarantee Assurance, Ltd. (IGA). IGA is a subsidiary of Castle and Mr. Kaplan, the managing director of Castle, shared office space with IGA. Mr. Searle declined to accept a line on the treaty for IGA but indicated that Mr. Kaplan might be interested in taking a line on the treaty for Castle. Mr. Searle discussed that possibility with Mr. Kaplan and then informed Mr. Fettroll that Castle was interested in a ten percent line, but it wanted a change in the commission procedure. Sev-

---

* The Honorable William C. Hanson, Senior United States District Judge for the Northern and Southern Districts of Iowa, sitting by designation.

1. The Honorable James H. Meredith, United States District Judge for the Eastern District of Missouri. The opinion is published at 507 F.Supp. 46 (E.D.Mo.1981).

2. Castle's argument that Article XVII of the reinsurance treaty, wherein Castle agreed to submit to the jurisdiction of any court of competent jurisdiction in the United States and that service of process could be made upon desig-nated parties in New York, did not give the Missouri court *in personam* jurisdiction is without merit. *See Perini Corp. v. Orion Ins. Co.,* 331 F.Supp. 453 (E.D.Cal.1971); *Oil Well Service Co. v. Underwriters at Lloyd's London,* 302 F.Supp. 384 (C.D.Cal.1969).

3. Contrary to Castle's arguments, the court's finding that Minet utilized the information supplied by Baker Reinsurance in its discussions of the proposed reinsurance with various underwriters is supported by substantial evidence and is not clearly erroneous.

eral days later, Mr. Kaplan agreed to drop Castle's request for a different commission procedure and agreed to a ten percent line of the treaty on behalf of Castle. In a letter to Minet dated November 14, 1975, Castle confirmed its acceptance of a ten percent share.

On July 5, 1976, Mr. Thirkill, Castle's chief underwriter, signed the treaty accepting a ten percent line. The treaty was in effect from July 1, 1975, through December 31, 1976.

At the beginning of the treaty, Castle received premium money from its investment. The treaty later became a losing proposition and Castle refused to pay its portion of the losses. On November 22, 1978, Old Reliable instituted this breach of contract action against Castle to recover Castle's portion of the treaty losses. Castle responded by asserting a third-party complaint against Minet and by arguing that Minet and Old Reliable induced Castle to enter into the treaty through false misrepresentations and omissions. Additionally, Castle contended that Old Reliable breached part of its contractual duties and that Minet negligently misrepresented the treaty to Castle.

After a trial to the court, the court ruled that Castle owed Old Reliable $541,322 for breaching the contract. *Old Reliable Fire Insurance Co. v. Castle Reinsurance Co.*, 507 F.Supp. 46, 50 (E.D.Mo.1981). The court determined that the actions of Old Reliable and Minet conformed to the usual practices of the industry and did not amount to fraudulent or negligent misrepresentations or omissions. Also, the court determined that Old Reliable had not breached contractual promises to Castle. *Id.* at 49.

## II. ANALYSIS

### A. *Describing the Insurance to be Reinsured*

Castle argues that the district court erred in concluding that "[i]n the insurance industry, and in the London market in particular, automobile physical damage risk is properly described as 'property business.'" *See Old Reliable Fire Insurance Co. v. Castle Reinsurance Co., supra*, 507 F.Supp. at 49. A related claim is Castle's contention that the court erred in stating that "[t]he portfolio to be reinsured by the Treaty was in fact 'approximately 65% property and 35% casualty.'" *Id.*

◼ Our review of the above fact finding is limited by the clearly erroneous rule. Fed.R.Civ.P. 52(a). *See McCluskey v. Board of Education*, 662 F.2d 1263 (1981). Substantial evidence supports both findings of the trial court. The managing director of the North America Treaty Division of Minet in 1975, Mr. Fundell, testified that it is customary to treat automobile physical damage as property insurance. An experienced underwriter with John Poland and Company, Mr. Theobald, testified that automobile physical damage belongs in the property account. Mr. Thorvaldsson, the managing director of Trygging, an Iceland reinsurance company, stated that automobile physical damage should certainly be classified as property. Although two Castle employees testified to the contrary, this court must give due regard "to the opportunity of the trial court to judge the credibility of the witnesses." *Kendrick v. Commission of Zoological Subdistrict*, 565 F.2d 524, 526 (8th Cir. 1977). The finding of fact that automobile physical damage is properly described as property is not clearly erroneous. Since Castle's argument regarding the court's finding that the treaty was approximately 65% property and 35% casualty depends upon automobile physical damage being excluded from property, that finding of fact is likewise not clearly erroneous.[4]

### B. *Information Available to Kaplan*

Castle challenges the court's fact finding that "[a]t the time Mr. Kaplan was con-

---

4. Castle also challenges the court's fact findings that the telex and the placing slip prepared by Minet outlined the salient terms of the proposed reinsurance. Both documents are summaries of the terms of the treaty, both indicate that the treaty includes automobile business and both cover the significant aspects of the treaty. The court's findings are not clearly erroneous.

sidering taking the line in the Treaty on behalf of Castle, he had available to him the entire Minet broking file including the broking slip prepared by Minet, the Telex prepared by Minet, and a photocopy of Best's Insurance Reports. All of these were made available to Mr. Kaplan by Minet." *See Old Reliable Fire Insurance Co. v. Castle Reinsurance Co., supra*, 507 F.Supp. at 48.

Mr. Fettroll, the Minet broker, first spoke to Mr. Searle of IGA and although Mr. Searle declined to accept a line on the treaty, Mr. Searle did discuss the treaty with Mr. Kaplan that same day. Mr. Fettroll testified that Mr. Searle took the placing slip and the Minet broking file containing the telex and a photocopy of Best's reports with him when he went in to see Mr. Kaplan. Mr. Searle testified that he could not recall the specific meeting with Mr. Fettroll but that Mr. Fettroll normally had the file with him when he came to place a treaty with IGA.

Mr. Thirkill, the underwriter and general manager of the Gibralter office of Castle, testified that Mr. Kaplan talked to him after the treaty had been placed. He testified that Mr. Kaplan told him that the broker had shown Mr. Kaplan various bits of information, including statistics and background information on Old Reliable.

Mr. Kaplan testified that he did not remember receiving any documents regarding the treaty other than the telex. However, he agreed that he might have received some other documents and did not recall them. Therefore, testimony supports the fact finding of the district court that Kaplan had access to the entire Minet file and that finding is not clearly erroneous.[5]

### Ç. *Customs in Placing Reinsurance Treaties*

The district court found that "[b]y custom and practice in the reinsurance indus-try, and in the London market in particular, the usual and customary practice of underwriters is to ask questions and seek additional information from brokers when they have questions concerning potential business." *Old Reliable Fire Insurance Co. v. Castle Reinsurance Co., supra*, 507 F.Supp. at 49. Although Castle argues that this is erroneous, the finding is supported by the testimony of four different witnesses. Mr. Fettroll testified that it was the custom for brokers to put information about the proposed transaction in summary form. Then the normal procedure was for the underwriters to question the broker and the broker would answer the questions. In a proposed treaty where automobile is listed as part of the business, Mr. Fettroll stated that the underwriter would ask what proportion of the business was automobile if he was interested in knowing that.

Mr. Fundell testified that in the insurance brokering business there are often very extensive oral discussions and that the underwriter would normally ask questions. He pointed out that sometimes the insurance broker has to contact his client to get more information so that the underwriter's questions can be answered. He stated that one would reasonably expect the underwriter to ask questions regarding the treaty lines. For example, if automobile is listed as a line, the underwriter would question whether that involved automobile physical damage or liability or both.

Mr. Theobald, an experienced underwriter, testified that placing reinsurance is a team concept with a broker coming to see the underwriter and presenting his information and the underwriter asking questions so that the two professionals can arrive at a satisfactory conclusion. He further stated that if he saw automobile listed as part of the lines covered, he would want

---

**5.** Castle also urges that the court erred in finding that Mr. Kaplan accepted a line on the treaty fully aware of the problems of automobile insurance and the fact that the treaty contained automobile insurance. The telex and the placing slip which Mr. Kaplan received both indicated that the treaty included automo-bile business. *See* n.4, *supra*. Mr. Kaplan testified that he knew that in 1975 half of the insurance business in the United States was automobile and that American proportional treaties were not having good results in 1975. Therefore, the district court's finding is not clearly erroneous.

to determine whether it was physical and liability and whether it was commercial or private automobile.

Mr. Searle testified that if a treaty proposal indicated automobile coverage, he would want more details before deciding whether to accept a line so he would check Best's for information and then question the broker to obtain information more current than that contained in Best's. Mr. Searle also stated, after reviewing the telex in this case, that he would have questioned the broker and checked Best's to find out the automobile content of the business.

As indicated by the above testimony, substantial evidence supports the court's finding that the customary practice includes an underwriter asking questions in order to gain additional information regarding the proposed reinsurance business.

Two related conclusions of law challenged by Castle are that "[t]he actions of Mr. Kaplan in accepting the 10% line in the Treaty on behalf of Castle without substantial inquiry past the Telex were not in accordance with the usual and customary practices within the industry" and that "[t]he acts and representations of Minet with respect to the placing of the Treaty with Castle were in conformity with the usual and customary practices within the industry and did not amount to fraudulent or negligent misrepresentations or omissions." *See Old Reliable Fire Insurance Co. v. Castle Reinsurance Co., supra,* 507 F.Supp. at 49. Castle argues that the standard of utmost good faith applicable to brokers required Minet to specifically tell Kaplan the amount of the automobile content in the treaty.

■ As previously discussed, Minet utilized information from Baker Reinsurance and Old Reliable to prepare, as was customary, a placing slip and a telex which contained all the salient terms of the proposed reinsurance. *See* n.4, *supra.* These documents both indicated that automobile was included in the treaty and the telex appropriately characterized automobile physical damage risk as property business therefore stating that the portfolio to be reinsured

was approximately sixty-five percent property and thirty-five percent casualty. There is no fraudulent misrepresentation of the portfolio in these documents.

■ Minet presented the documents to Mr. Kaplan in the usual and customary manner and did not misrepresent the treaty to Mr. Kaplan. Mr. Fettroll, the Minet broker, was available to answer any questions Mr. Kaplan felt were necessary to ask regarding the treaty. Mr. Kaplan testified that Mr. Fettroll answered every question asked but that he did not question Mr. Fettroll about the automobile portion of the treaty. Two experienced underwriters, Mr. Searle and Mr. Theobald, testified that if they had been presented with the same telex, they would have asked questions regarding the automobile portion of the treaty. Further, Mr. Kaplan admitted that according to the assumptions he was relying upon, as much as thirty-five percent of the treaty could have been automobile business. Although Mr. Kaplan's own reinsurance treaty expressly excluded automobile business, he asked no questions regarding the automobile content, did not consult Best's reports and merely "assumed" the automobile content was minimal. He made this assumption despite the fact that he had the entire Minet broking file available to him. We agree with the district court that Mr. Kaplan's actions of accepting a portion of the treaty without substantial inquiry were not in accord with industry customs.

■ We also agree that Minet's actions do not amount to fraudulent or negligent omissions. The slip and telex are only a summary of the proposal and both clearly state that automobile is a portion of the business. None of the lines of the business listed include a percent figure regarding the proportion of that particular line. In light of the customs of the industry and because these documents are only a summary of the business and they disclose the nature of the business, we cannot agree with Castle that Minet breached its duty of good faith by failing to list the automobile percentage of the business.

### D. *Policy Goals*

The district court concluded that "[t]he expressed policy goals of Old Reliable to 1) tighten its underwriting procedures, 2) require policy holders to insure to value, and 3) force policy holders to increase the value of their policies by 30% on renewal did not amount to contractual promises to Castle as part of the quota share Treaty." *Old Reliable Fire Insurance Co. v. Castle Reinsurance Co., supra,* 507 F.Supp. at 49. Castle contends that the above three items, which were set forth in the *telex,* should be deemed binding provisions of the reinsurance *treaty.*

The president of Old Reliable at the time of this treaty testified that these statements were not promises to the reinsurers but were objectives of the company to improve underwriting in the future. The telex paragraph setting out the goals begins: "In line with general USA trend company is further tightening underwriting procedures with emphasis being placed upon * * *." That language certainly does not indicate any promise on behalf of Old Reliable, but instead describes the areas of underwriting which the company hopes to improve. The court did not err in concluding that the statements regarding underwriting procedures were not contractual promises.

We have examined Castle's other arguments challenging the district court's decision that Castle failed to sustain its affirmative defenses, its counterclaims and third-party complaint and we find them unconvincing. We affirm the district court's judgment awarding Old Reliable $541,322 plus interest against Castle.

Affirmed.